## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| U.S. CONSTRUCTION, INC.,<br>400 Market Street, Suite 415,<br>Philadelphia, Pennsylvania 19106<br><br>Plaintiff,<br><br>v.<br><br>NATIONAL REALTY<br>INVESTMENT ADVISORS, LLC<br>1 Harmon Plaza, 9th Floor,<br>Secaucus, New Jersey 07094<br><br>Defendant. | Civil Action No.: 2:22-cv-01198<br><br><br><br><br>**COMPLAINT**<br>**& JURY DEMAND** |

Plaintiff U.S. Construction, Inc. ("USC") by way of complaint against Defendant National Realty Investment Advisors, LLC, ("NRIA") alleges as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction over this action by virtue of 28 U.S.C. § 1332 because there is a complete diversity of citizenship between Plaintiff and Defendant, and the amount in controversy, exclusive of interest, costs, and attorney's fees, exceeds the sum of $75,000.

2.      Pursuant to Local Rule 5.1.1, USC states that this matter is not subject to compulsory arbitration under Local Rule 53.2.

3.      Venue is proper in this jurisdiction by virtue of 28 U.S.C. § 1391(b)(2) because the claims in this action involve a written contract regarding the development of land, and the performance of development work and related activity, in the Eastern District of Pennsylvania, specifically at

1401 S. Christopher Columbus Boulevard, Philadelphia, Pennsylvania, 19148.

## PARTIES

4.  USC is a Nevada corporation with its headquarters at 400 Market Street, Suite 415, Philadelphia, Pennsylvania, 19106.

5.  NRIA is a Delaware limited liability company with its headquarters at 1 Harmon Plaza, 9th Floor, Secaucus, New Jersey 07094.

6.  NRIA's sole member is Rey Grabato. Mr. Grabato is a resident and citizen of New Jersey.

## FACTS COMMON TO ALL COUNTS

### Acquisition of the Property

7.  On December 27, 2017, South Christopher Columbus Capital 1499 LLC (the "Owner") purchased adjoining parcels 1401 S. Christopher Columbus Boulevard, Philadelphia, PA and 1401R S. Christopher Columbus Blvd (collectively the "Property" or "1401") for $20,400,000.

8.  At various times during development, the Property was also referenced as 1499 S. Christopher Columbus Boulevard.

9.  NRIA exercised and exercises control of the Owner through NRIA's position in the Owner's chain of membership.

10. USC facilitated the acquisition of the Property for development by Owner and NRIA.

### Development of the Property

11. In or about November 2017 NRIA entered a co-developer agreement (the "Agreement") with USC to proceed with the development of the Property in three phases to be followed by physical construction.

12. That Agreement was later memorialized in a July 20, 2021 writing reflecting what had occurred through that date, what was still to occur, and the financial compensation to be received

by USC.

13. Development Phase I consisted of two primary parts: (i) a 370-residence multi-use building on the southern portion of the Property; and (ii) development of the northern portion of the Property as 179 townhomes, and then, following an approach by an well-known operator, as a driving range facility.

14. USC's obligations under Development Phase I included performing, and USC did perform, the following tasks in relation to the multi-use building on the Southern portion of the Property and the driving range facility and townhomes on the Northern portion of the Property:

    a. oversee feasibility study with third-party reviewer and redesign based on feasibility recommendations;

    b. perform value engineering exercises and redesigns, including creating and using full financial models to test for project financial feasibility;

    c. attend civic meetings and obtain neighborhood approval for multi-use building;

    d. attend meetings with and gain approval from Delaware River Waterfront Commission for multi-use building;

    e. submit for and obtain Philadelphia Water Department conceptual storm water approval for multi-use building;

    f. submit for, present for, and obtain civic design review approval from Philadelphia Planning Commission for multi-use building;

    g. submit for and obtain zoning site plan approval for multi-use building;

    h. submit for and obtain technical streets approval for multi-use building;

    i. submit for and obtain technical storm water approval for multi-use building;

    j. submit for ACT II relief from the Pennsylvania Department of Environmental

Protection;

k. obtain and coordinate permit set drawings for structural, mechanical, electrical, plumbing, civil, landscape, geotechnical, environmental, and lighting for multi-use building;

l. complete interior design package with all material designed and selected for multi-use building;

m. create initial marketing including all marketing packages and branding and trade marking "Philadelphia Water Club;"

n. submit for and obtain building permit for multi-use building;

o. re-design multi-use building more modular construction;

p. submit for and obtain 10-year tax abatement for muti-use building;

q. create conceptual design and program for driving range facility;

r. engage with driving range facility operator, including numerous meetings, to facilitate sale of northern portion of Property;

s. attend civic meetings and obtain neighborhood approval for townhomes;

t. submit for and obtain Philadelphia Water Department conceptual storm water approval for townhomes;

u. submit for, present for, and obtain civic design review approval from Philadelphia Planning Commission for townhomes; and

v. submit for and obtain zoning site plan approval for townhomes.

15. Development Phases II and III consisted of a change in the direction for the northern portion of the Property from the 179 townhomes developed under Phase I to a 331-residence multi-use building in Phase II and an additional 145 to 261-residence multi-use building in Phase III.

16. USC's obligations under Development Phases II and III included performing, and USC did perform, the following tasks:

 a. attend civic meetings and obtain neighborhood approval;

 b. submit for and obtain Philadelphia Water Department conceptual storm water approval;

 c. submit for, present for, and obtain civic design review approval from Philadelphia Planning Commission;

 d. submit for and obtain zoning site plan approval;

 e. submit for and obtain technical streets approval;

 f. submit for and obtain technical storm water approval;

 g. obtain and coordinate permit set drawings for structural, mechanical, electrical, plumbing, civil, landscape, geotechnical, environmental, and lighting for multi-use building;

 h. submit for and obtain building and foundation permits;

 i. prepare construction document building sets;

 j. re-design Phase III with full value engineering and advanced underwriting analysis for financial feasibility in case larger, denser alternatives are considered for Phase III; and

 k. submit for and obtain 10-year tax abatement;

17. USC additionally prepared construction budgets based on NRIA's instructions and, on the completion of development, solicited bids for the physical construction.

18. The Agreement further called for USC to serve as the general construction contractor to carry out its pre-existing development work.

19. Starting in mid-2021, NRIA repeatedly told USC to prepare to break ground on physical construction in the fourth quarter of 2021.

20. In response to NRIA's instruction to prepare for groundbreaking, USC brought on additional personnel to assist in project management. USC ultimately had to let those personnel go when NRIA terminated the Agreement.

21. USC met its obligations under the Agreement, or was prepared to do so, prior to NRIA's unilateral and unjustified decision not to proceed with the project.

22. The Agreement did not permit NRIA or the Owner to cancel the project, terminate the Agreement, or terminate USC's rights to compensation without USC's consent.

### USC's Compensation Under the Agreement

23. USC's compensation under the Agreement was a combination of five different elements: (1) reimbursement of all development expenditures ("Reimbursable Costs"); (2) flat rate development fees on a set schedule amounting to a combined $2,850,000 ("Flat Rate Fees"); (3) 15% of net income from the project on the completion and sale of each Phase (the "15% Fee"); (4) a general contractor's fee of 3.75% of hard construction costs (the "3.75% Fee"); and (5) a general conditions fee of 4.00% of construction costs (the "4% Fee").

24. Throughout its performance of the development work, USC incurred Reimbursable Costs, including, *inter alia*, professional service fees.

25. Throughout its performance of the development work, USC would invoice Reimbursable Costs directly to NRIA, and NRIA would promptly pay USC for same.

26. Between February 2020 and November 2021, cost reimbursements associated with the project were submitted from USC to NRIA and paid by NRIA on nineteen (19) separate occasions. These reimbursements were paid to USC within two weeks of the time they were submitted.

27.     Throughout its performance of the development work, USC was owed Flat Rate Fees on a set schedule. Flat Rate Fees for Phase I were $1,250,000; Flat Rate Fees for Phase II were $800,000; and Flat Rate Fees for Phase III were $800,000.

28.     Before August 1, 2021, USC had been paid all Flat Rate Fees for Phase I and $420,000 for Phases II and III combined.

29.     An additional $400,000 was paid for Phases II and III combined on or after August 1, 2021, and prior to December 1, 2021.

30.     Remaining combined payments for Phases II and III (the "Outstanding Flat Rate Fees") were and are due on the following schedule:

   a.  $100,000 on December 1, 2021;

   b.  $140,000 when building permits were issued and tax abatement applications were submitted, all of which occurred prior to December 31, 2021;

   c.  $100,000 on January 1, 2022;

   d.  $100,000 on February 1, 2022;

   e.  $50,000 on March 1, 2022;

   f.  $50,000 on April 1, 2022;

   g.  $40,000 on May 1, 2022; and

   h.  $200,000 on completion of construct and return of capital.

31.     Both NRIA and USC possess data sufficient to establish the value of the 3.75% Fee, the 4% Fee, and the 15% Fee to a reasonable degree of certainty despite the Property not being sold and construction not being commenced.

<u>NRIA Decides Not to Commence Construction or Sell the Property</u>

32.     In or about December 2021, NRIA stopped making payments to USC despite all

development work being completed by USC.

33. In or about December 2021, NRIA informed USC that it no longer believed that the project was sufficiently profitable for NRIA if USC remained involved, that NRIA would not begin construction on the site, and that NRIA would look to sell the property without construction or additional development.

34. USC's development plans remain profitable for USC and NRIA if they proceed.

35. NRIA simply believes its own profits are not sufficient if USC participates moving forward.

NRIA Fails to Fully Compensated USC

36. The cessation of payments left USC with approximately $1,180,068 in Reimbursable Costs unpaid.

37. The Reimbursable Costs referenced in Paragraph 36 are amounts owed by USC to architects and the modular unit designer.

38. Additionally, Outstanding Flat Rate Fees of $440,000 have come due since NRIA stopped making payments to USC.

39. In the coming months, an additional $140,000 in Outstanding Flat Rate Fees will become due.

40. If construction proceeded as it was supposed to, an additional $200,000 in Outstanding Flat Rate Fees would come due under the payment schedule.

41. The value of the 3.75% Fee is approximately $7,655,425.00.

42. The value of the 4% Fee is approximately $7,944,132.00.

43. The value of the 15% fee is approximately $12,134,948.00..

44. NRIA's termination of the Agreement and failure to properly compensate USC has caused

USC losses of approximately $29,694,573.00.

### USC's Effort to Mitigate

45. In order to mitigate its damages, on December 6, 2021, USC obtained a credible offer to purchase the Property for $40,000,000, nearly twice the price for which the Property was purchased only four years before.

46. If NRIA accepted the offer, it would obtain substantial funds that could be used to partially compensate USC for its losses.

47. NRIA has not acted upon the offer nor has NRIA responded to USC's requests to act on the offer, despite USC's repeated communications to NRIA regarding the urgency of the offer.

### COUNT I
### Breach of Contract

48. The allegations of the preceding paragraphs are incorporated herein as if set forth at length.

49. The Agreement is a valid and enforceable contract between USC and NRIA.

50. USC performed all of its contractual obligations set forth in the Agreement regarding development and stood ready to perform the remainder of its contractual obligations set forth in the Agreement at the time of NRIA's breach.

51. NRIA breached the Agreement by: failing to pay USC for all reimbursable costs; failing to pay all Outstanding Flat Rate Fees that have become due and terminating the Agreement such that Outstanding Flat Rate Fees that would have come due will not come due; and by terminating the Agreement such that the 4% Fee and the 3.75% Fee will not be paid at all, and the 15% Fee will be, at minimum, significantly reduced.

52. NRIA's breach of the contract damaged USC in the amount of approximately $29,694,573.00.

**WHEREFORE**, Plaintiff U.S. Construction, Inc. demands judgment against Defendant

National Realty Investment Advisors, LLC on Count I for the following:

    a.    Compensatory damages, including both direct and consequential damages;

    b.    Pre- and post-judgment interest;

    c.    Costs of litigation; and

    d.    Such other relief as the Court deems just and proper.

## COUNT II
### Breach of Contract Based Upon the Covenant of Good Faith and Fair Dealing

53.    The allegations of the preceding paragraphs are incorporated herein as if set forth at length.

54.    This Count II is brought in partial alternative to Count I as it relates to the 3.75% Fee, the 4% Fee, and the 15% Fee

55.    USC's reasonable expectation when entering into an Agreement where a portion of its compensation was tied to, or partially dictated by, the construction of the project following USC's development services, was that NRIA would not prevent construction from moving forward.

56.    USC's expectation was particularly reasonable where the Agreement provides no right for NRIA to terminate before construction, USC is obliged to serve as the general contractor, NRIA's basis for termination was that NRIA would not receive sufficient profit under the terms of the Agreement it had already bargained for, USC is termed a "co-developer" under the Agreement, and the Agreement calls for profit sharing.

57.    NRIA has breached the covenant of good faith and fair dealing and has acted in bad faith and antithetically to the purpose of the Agreement by refusing to proceed with construction of the project.

58.    NRIA has further breached the covenant of good faith and fair dealing and has acted in bad faith and antithetically to the purpose of the Agreement by refusing to sell the Property to partially

compensate USC for its losses.

59. NRIA's breach of the covenant of good faith and faith dealing constitutes a breach of contract, and USC has been damaged thereby in the amount of approximately $29,694,573.00.

**WHEREFORE**, Plaintiff U.S. Construction, Inc. demands judgment against Defendant National Realty Investment Advisors, LLC on Count II for the following:

   a. Compensatory damages, including both direct and consequential damages;

   b. Pre- and post-judgment interest;

   c. Costs of litigation; and

   d. Such other relief as the Court deems just and proper.

## COUNT III
### Promissory Estoppel

60. The allegations of the preceding paragraphs, except those referencing the existence of a contract between USC and NRIA, are incorporated herein as if set forth at length.

61. This Count III is brought in the alternative to Counts I and II to the extent that there was no contract between the NRIA and USC covering any particular aspect or aspects of USC's losses.

62. NRIA made a promise to USC that it would develop and construct improvements on the Property with USC acting a co-developers and that NRIA would compensate USC by, *inter alia*, providing USC a portion of the construction costs and net profits from the project.

63. NRIA should have reasonably expected that its promises identified in Paragraph 62 would induce USC to act.

64. USC engaged in the development services it provided, including, but not limited to out-of-pocket expenditures and undertaking obligations to third parties, in reasonable reliance on NRIA's promises.

65. Injustice can only be avoided by requiring NRIA to proceed with the Project or by NRIA

fully compensating USC for its services.

**WHEREFORE**, Plaintiff U.S. Construction, Inc. demands judgment against Defendant National Realty Investment Advisors, LLC on Count III for the following:

a. Restitution for the reasonable value of USC's services; and/or

b. Enjoining NRIA to proceed with the project; and

c. Such other relief as the Court deems just and proper.

## COUNT IV
### Quantum Meruit/Unjust Enrichment

66. The allegations of the preceding paragraphs, except those referencing the existence of a contract between USC and NRIA, are incorporated herein as if set forth at length.

67. This Count IV is brought in the alternative to Counts I and II to the extent that there was no contract between the NRIA and USC covering any particular aspect or aspects of USC's services or losses.

68. USC performed substantial development services for NRIA, including, but not limited to, making out-of-pocket expenditures and obligating itself to third parties for NRIA.

69. NRIA has substantially benefitted from those services in the form of a substantial increase in the value of the Property and the ability to construct improvements on the Property to make it even more valuable.

70. It would be inequitable for NRIA to have accepted and retained those benefits without having paid the reasonable value of same to USC.

71. USC remains uncompensated for much of its development services.

**WHEREFORE**, Plaintiff U.S. Construction, Inc. demands judgment against Defendant National Realty Investment Advisors, LLC on Count IV for the following:

a. Restitution for the reasonable value of USC's services; and

b.  Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands trial by jury on all issues.

                          HANKIN, SANDMAN, PALLADINO
                          WEINTROB & BELL, P.C.

                          By: *s/ Evan M. Labov, Esq.*
                          Evan M. Labov, Esq. (Attorney ID 313916)
                          John F. Palladino, Esq. (Attorney ID 383870)
                          HANKIN SANDMAN PALLADINO
                          WEINTROB & BELL, P.C.
                          30 South New York Avenue
                          Atlantic City, NJ 08401
                          Telephone: (609) 344-5161
                          Fax: (609) 344-7913
                          *John@hankinsandman.com*
                          *EvanL@hankinsandman.com*
                          *Counsel for Plaintiff,*
                          *U.S. Construction, Inc.*

Dated: March 29, 2022